## BRAY et al. v. UNITED STATES FIDELITY & GUARANTY CO.

### In re EVANSVILLE CONTRACT CO.

(Circuit Court of Appeals, Fourth Circuit.   July 6, 1920.)

No. 1782.

1. **Bankruptcy ☞269—Denial of fraud in sale of claims conclusive, without proof, unless contradicted by admissions.**

   An answer by the trustee in bankruptcy and the buyer from him, denying fraud in the sale of claims of the bankrupt, is conclusive, in the absence of proof to the contrary, unless other admissions in the answer established fraud.

2. **Bankruptcy ☞269—Evidence held not to show fraud in sale of claims.**

   Evidence that a trustee sold claims by the bankrupt against the United States on which suits were pending in the Court of Claims, after notice was given to all the creditors, *held* insufficient to show fraud, though the buyer was the former manager of the bankrupt, and judgments had already been rendered on some of the claims for more than the amount received, subject to appeal by the United States.

3. **Bankruptcy ☞269—Creditor can set aside trustee's sale after 7 years' delay only for clear fraud.**

   Where a creditor had knowledge of the facts which he claimed showed fraud by the trustee in making a sale of the bankrupt's claims against the United States, or had notice of the creditors' meeting at which those facts were fully disclosed, he cannot set aside the sale for the fraud on a petition filed 7 years thereafter, unless there was the most cogent and convincing evidence of fraud.

4. **Bankruptcy ☞269—Delay in seeking avoidance of trustee's sale held not excused.**

   Delay by a creditor in seeking to avoid a sale by the bankrupt's trustees of the bankrupt's claims against the government is not excused by the creditor's ignorance of a letter from the trustee to the referee, stating that judgments subject to appeal had been recovered on some of the claims for an amount in excess of the purchase price, where the creditor had notice of the meeting at which the fact stated in the letter was made known to the creditors.

5. **Bankruptcy ☞263—Knowledge by former manager of bankrupt does not preclude buying claims.**

   The fact that the buyer of claims of a bankrupt against the United States was the former manager of the bankrupt, who had more knowledge of the merit of the claims and more confidence of ultimate success than the creditors, does not require the sale to be set aside, where there was

no fraud or concealment, and the creditors had opportunity to ascertain for themselves the situation of the claims.

Appeal from the District Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton, Judge.

Bankruptcy proceedings against the Evansville Contract Company. From a decree granting the petition of the United States Fidelity & Guaranty Company to set aside as fraudulent a sale of claims by the bankrupt, made by M. J. Bray, as trustee in bankruptcy, to Jacob Eichel, the trustee and the buyer appeal. Reversed and remanded, with directions.

George W. Johnson, of Parkersburg, W. Va., for appellants.

B. M. Ambler, of Parkersburg, W. Va. (Van Winkle & Ambler, of Parkersburg, W. Va., on the brief), for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

KNAPP, Circuit Judge. On February 27, 1904, the Evansville Contract Company, an Indiana corporation, was adjudicated bankrupt by the District Court for the Northern District of West Virginia. The trustees appointed were the appellant M. J. Bray and two others, of whom one died and the other resigned, so that in March, 1906, Bray became the sole trustee. Among the assets of the bankrupt which passed to the trustees were certain claims against the United States, growing out of previous transactions with the government, on which suits had been brought and were then pending in the Court of Claims. On April 30, 1908, the referee confirmed a sale of these claims to Jacob Eichel, the other appellant, for the sum of $6,500, and the relinquishment by him of a claim of $700 for services rendered and expenses incurred for the bankrupt estate.

In 1915, 7 years later, the United States Fidelity & Guaranty Company, appellee here, by petitions filed with the referee, asked that this sale be set aside, on the ground that it had been procured by fraud and collusion on the part of Bray and Eichel, and that they be required to pay into court for the benefit of creditors the difference between the amount for which the claims were sold to Eichel and the amounts subsequently collected on the judgments rendered by the Court of Claims against the United States. In his report and order of February 24, 1919, the referee in substance granted the relief prayed for, by sustaining the charge of fraud, and directing Bray and Eichel to pay to the estate the sum of $17,387.78, with interest from July 30, 1912. By decree of September 22, 1919, the court below confirmed the report and order of the referee. Bray and Eichel appeal.

In order to decide the controversy on the merits, we put aside all other questions and proceed to inquire whether the decision under review is warranted by the evidence. Were the appellants guilty of the fraud of which they stand accused? It is to be observed at the outset that no oral testimony was introduced, and no witness offered for examination, at the hearing before the referee. On this issue of fraud and collusion the proofs consist wholly of what appears in the several

petitions filed by the appellee, in the sworn answers of Bray and Eichel, and in other papers of record in the bankruptcy proceeding. It is also to be noted that these pleadings of the parties, to so describe them, which set forth their respective contentions, disclose no substantial dispute as to the demonstrative facts; that is, facts which could be testified to by a witness or evidenced by a written document. In other words, there is little, if any, disagreement as to what actually happened prior to and in connection with the sale of the claims to Eichel. It follows that the wrongdoing asserted, if any there was, is purely a matter of inference from facts that are not in contradiction. This prepares us for taking up somewhat in detail the transaction in question.

Bray and Eichel both lived in Evansville, and their relations were undoubtedly friendly. For some years, perhaps from the first, Eichel had been the president and general manager of the Evansville Contract Company, and was presumably familiar with the affairs of that concern, including its contracts with the government, which were in course of performance when the bankruptcy occurred, and its claims against the United States then pending in the Court of Claims. By order of April 11, 1904, the trustees were authorized to complete these unfinished contracts with the government, and for that purpose to employ Eichel at a salary of $500 a month. In their petition for this order the trustees urged the employment of Eichel on the ground that it would be impossible without his aid to carry on the work of completing the contracts, or to properly prepare for trial the claims against the United States. He was in fact employed and paid for 13 months, that is, until some time in May, 1905, when the contracts were practically completed, as we understand, and his services terminated accordingly. From that time, which was nearly 3 years before his purchase of the claims, he had nothing whatever to do with the administration of the bankrupt estate and sustained no fiduciary relation thereto. In the meantime, however, in February, 1905, the other trustees, Bray being absent, made a general report to the referee of the situation of the estate, in the course of which it is briefly stated, regarding the suits in the Court of Claims, that the Washington attorneys say in a recent letter:

"That they can form no estimate either as to the amount we can hope to recover or as to the time when we can hope to recover."

On September 1, 1906, Bray, then sole trustee, filed a petition with the referee, which set forth in substance that practically nothing remained to be done in the administration of the estate, except to prosecute the claims pending in the Court of Claims, a descriptive list of which was annexed; that it was impossible to tell when the suits would be decided; that to await their decision might delay for years the settlement of the estate; and that meanwhile considerable expense would be incurred for office rent, looking up witnesses, taking depositions, and the like. He therefore asked for authority to sell these claims, and all other choses in action, at public auction, after such notice as might be directed. The referee thereupon called a meeting of creditors to pass on this petition, and such meeting was held on the 11th of Septem-

ber, the appellee being represented by its attorney, Mr. Ambler. Bray was interrogated in regard to the claims and filed·his deposition. On consideration of the matter, no one objecting, an order was made for a sale of the claims at public auction on the 29th of September, and prescribing the notice to be given. On the day named the claims were sold to Eichel for $3,000, he being the only bidder. On the 17th of October objections to the sale were filed and its confirmation opposed by two creditors, on the ground that the price was inadequate, and that the claims should not be sold to the former president of the bankrupt company until the creditors were put in possession of all his information regarding the same, "and the full details of all the evidence relating thereto are laid before the referee in bankruptcy."

Three days later Bray filed a sworn answer to these objections, in which he states, among other things, that the sale was advertised in the manner and for the length of time required by the order of the referee; that the sale was open and fair in all respects; that Eichel was the only bidder; that he "is anxious to realize all that can be realized out of these claims, but not having sufficient foreknowledge to.guess with any degree of accuracy as to how a law suit will terminate, and more especially how half a dozen or more law suits will terminate, he has no recommendation to make to this court as to the confirmation or rejection of this sale, but he does desire, however, before the court acts in this matter, to have it consider the following facts as bearing thereon"; that all the claims in question had been passed upon adversely by the engineers in charge of the works out of which the claims arose, by the Chief·Engineer of the United States, and by the Comptroller of the Treasury; that the taking of testimony had not been concluded in two of the suits and not commenced in a third; that in the remaining cases the testimony was supposed to be complete, but there was no assurance that further testimony would not be taken by one side or the other; that the taking of such testimony was expensive for reasons mentioned; that the aggregate amount of the claims on their face was $125,818.50; that the attorneys prosecuting the same had "contracts for 20 per cent. and 25 per cent. of the recovery"; and that the sale should not be set aside unless the objecting creditors gave bond to protect the estate against loss.

On these objections and the answer of.Bray there was a hearing before the referee, with the result that two lawyers were appointed, one for the trustee and one for the objecting creditors, to investigate the condition of the claims and report thereon. These gentlemen soon afterwards went to Washington, made their examination, and on November 15th filed a report which describes generally the status of the claims, expresses the opinion that "a considerable portion of said claims so matured appear to be meritorious and seem to deserve a favorable consideration and determination by the court, but of course we do not pretend·by this statement to guarantee a judgment in favor of the claimant as to any of these matters," and recommends that the sale be not confirmed. Following this was an order refusing confirmation and setting aside the sale.

In January, 1907, Bray filed another petition with the referee, briefly reciting the prior sale and its rejection, stating that the holders of a large amount of the proven debts had requested that a meeting of creditors be called to determine whether the claims should be again offered for sale, with the view of winding up the trust, and asking the court to decide whether such sale should be ordered at that time or deferred until after decision by the Court of Claims. The trustee also set forth the existing situation of the suits as to the taking of depositions, printing testimony, filing briefs, and the like, and added:

"That a copy of the entire printed records in all of these cases pending in the Court of Claims is now in the hands of the attorney for this trustee, and that any creditor of this estate, or the attorney of any such creditor, who may desire to inspect these records so as to inform himself as to the status of these several cases, of their amounts and the possibility or probability of recovery upon any of them, can have access to said records upon application to said attorney," and such investigation was invited, "so that creditors may form their own judgment as to the value of these claims, and be prepared to bid in the event another sale is ordered, or be prepared to vote intelligently upon the question as to whether there shall be another sale ordered at this time."

For reasons not disclosed by the record, no meeting of creditors was then called or other action taken on this petition. Indeed, nothing further appears to have been done about these claims until the latter part of March, 1908, when Eichel wrote the referee that he would pay $5,000 for them. Thereupon, under date of April 1st, the referee addressed a letter to all the attorneys representing creditors of the estate, informing them of this offer and asking their advice as to its acceptance. The same information was sent to Bray, the trustee, who answered on the 5th of April as follows:

"Yours of April 1st reached me just as I was leaving home. Through our attorneys, Dudley & Michener, I learn that judgments have been rendered in our favor in three cases amounting to $9,730, subject to appeal by the government. After all fees and expenses are paid, we ought to have something over $5,000 left. In view of the above judgments I think Mr. Eichel might raise his bid. I hardly think it worth going to the expense of calling a meeting of the creditors until you are ready to make a decision, as to the moneys now on hand, which I sincerely hope will have a tendency to draw the warring factions together, and enable us to close up this long drawn out piece of business."

One of the letters to the lawyers was addressed to Mr. Ambler, appellee's attorney, who returned on April 3d the following reply:

"I represent no interest whatever in that estate except the United States Fidelity & Guaranty Company, having resigned all connection with other claims. My client is only a surety, and holds a contract or bond of indemnity executed by certain banks of Indiana and Parkersburg, and will rely upon recourse against those banks for any liability that may be imposed. These facts are shown by records pending before the referee, and before the District and Circuit Courts of the United States. In the circumstances the United States Fidelity & Guaranty Company is not in position, nor has it authorized its counsel to make any agreement that could affect or release funds or claims to which indemnitors have a right to resort, and for that reason, we beg to be excused from expressing an opinion as to the probability that the offer would be accepted. My clients will neither accept nor decline, for the reason that it concerns the indemnitor banks rather than the Fidelity Company;

but you will permit me to say that, before your appointment, some of the creditors thought that matters were being somewhat juggled in the handling of these claims, and it would be well now to hold a meeting of the creditors to have decisive action taken upon that subject."

On due notice to creditors, including the appellee, a meeting was called for the 29th of April, but adjourned to and actually held the next day. At that meeting Eichel submitted a written offer for the claims of $6,500, and a release of his claim of $700 for services rendered and expenses incurred for the estate. A list of the claims, showing their respective amounts and the contracts out of which they severally arose, was annexed to the offer. The action taken appears of record as follows:

"After having considered the said proposition, the creditors present, as well as the attorneys present, representing sundry creditors (except Jacob Eichel, who declined to vote on account of being an interested party), unanimously accepted said proposition and directed the trustee to accept the said offer on the terms and conditions contained in said writing, and the court being of the opinion that it is and will be to the best interest of the estate to dispose of said claims on the terms named in said written proposition, it is adjudged, ordered, and decreed that said proposition, and its acceptance by the creditors present and represented, be and the same is hereby confirmed, and the trustee is hereby ordered and directed to execute to the said Jacob Eichel a proper and legal assignment of the said claims, the same to be without recourse, and on the terms set forth in the written proposition of said Jacob Eichel, the same to be executed and delivered to the said Eichel by the said trustee upon the payment of the sum of $6,500 by the said Jacob Eichel to the said M. J. Bray, trustee."

With this summary of the incidents leading up to and culminating in the sale of the claims to Eichel, we come to consider the grounds upon which that sale is attacked by the appellee. The bankruptcy of the Evansville Contract Company brought on many complications, and much litigation followed, of which the present proceeding is but a minor feature. Indeed, the greater part of the record relates to matters which have no appreciable bearing upon the controversy now before us. In July, 1912, the appellee filed a lengthy petition, which purports to amend a prior petition of February, 1906, but which contains no reference to the sale 4 years before of these claims against the United States.

Three years later, however, by petition filed in June, 1915, the appellee alleges the recent discovery of misappropriations by Bray and Eichel of thousands of dollars belonging to the estate, sets up the facts above stated as to the purchase of the claims by Eichel, avers that he controlled a majority of the creditors voting for the order of April 30, 1908, that appellee was not present or represented at the meeting held on that day, that no information was given of the value or condition of the claims, that important facts were concealed, which did not come to the knowledge of appellee until 1915, that Bray and Eichel violated their fiduciary duties and were guilty of actual fraud, gives the dates and amounts of the judgments rendered by the Court of Claims, and the dates of the payment thereof to Bray, and prays that the sale to Eichel be set aside, that Bray and Eichel answer the interrogatories addressed to them in regard to the moneys received from the govern-

ment, and that they be required to account for and pay over the same to the bankrupt estate.

A motion by Eichel to dismiss the petitions was overruled, and thereupon he and Bray filed separate answers under oath, in which each of them reviews the transaction in great detail, admits the facts above set forth regarding the sale of the claims, explains certain matters alleged to indicate wrongdoing, and denies every charge or insinuation of concealment, collusion, fraud, or other improper conduct. Among other things, Eichel says:

"That the recovery on said judgment for $9,700 was subjected to 20 per cent. discount for attorneys' fees, so that the net recovery thereon was $7,740, in round numbers; that said judgment was subjected to appeal by the government, and the right of appeal still existed; that said purchase was not the purchase of this one claim, but of all claims against the government; that all claims against the government were subject to a contract with Dudley & Michener, by which said estate was compelled to prosecute said claims to final judgment at the expense of said estate, attorney's fees alone excepted; that the prosecution of said claims could not be dropped without the consent of said attorneys, and without paying them just compensation for the services already rendered by them in prosecuting said claims; that this respondent offered for said claims $7,200, in round numbers, with the understanding that this respondent then got behind said claims and became personally responsible for the prosecution thereof, and the expense of all litigation incurred in the prosecution thereof; and this respondent now says that in the further prosecution of said claims he spent more than 2 years of his own time without further compensation than the additional recoveries obtained by him on said claims, and that he also expended in the further prosecution of said claims the sum of $3,000 or $4,000, which he risked and which said estate was unwilling to risk in the further prosecution thereof; and this respondent says that he had no greater assurance than any one else had that further judgments would be rendered in favor of said bankrupt's estate, as the result of further prosecution of said claims.

"This respondent again denies that at the time of the purchase of said claims he sustained any relation of trust or confidence whatsoever towards the estate of said bankrupt, or towards any of the parties interested therein or connected therewith, and respondent says in this respect that the records of the bankruptcy proceedings plainly show that this respondent was not in the employ of said trustees in bankruptcy in any manner or for any purpose after February 12, 1905. * * * This respondent says that the purchase of said claims was a speculation pure and simple; that time and money had to be expended in prosecuting said claims, and that there was no assurance that there would be any recovery on any more of them; that it was a speculation in which money might be lost or won, and this respondent was willing to take the risk of losing money therein, and the creditors of said estate were not willing to take said risk; and this respondent now says that while judgments were thereafter rendered in favor of said bankrupt's estate, on some of said claims, yet judgment was rendered against said bankrupt's estate on several of said claims, and that before judgment was finally rendered on all of said claims this respondent spent several thousand dollars out of his own pocket in procuring witnesses and in paying their traveling expenses and the traveling expenses of counsel, as well as his own expenses, and in otherwise maturing said claims for hearing, and also spent a great deal of valuable time, for all of which this respondent would not have been reimbursed if he had charged at the rate of $500 per month for his said services and the money so expended."

And Bray says in his answer, among other things:

"This respondent says that the said Jacob Eichel was not in the employ of this trustee in bankruptcy, or of the estate of said bankrupt, in any manner whatsoever, in the year 1906, or in the year 1907, or in the year 1908, or in

any subsequent year, and that it is not true that the said Jacob Eichel sustained any relation of employment or of confidence or trust to said bankrupt's estate on the 30th day of April, 1908, when he purchased the claims against the United States government and the Monongahela River Consolidated Coal & Coke Company, mentioned in the fourteenth paragraph of said petition. * ' * * This respondent says that it was known to the referee in bankruptcy at the time of said creditors' meeting on the 30th day of April, 1908, and was known to the creditors present and represented at said meeting, that said judgment had been rendered; and this respondent says that said referee in bankruptcy and the creditors of said bankrupt had been kept fully advised of the status of the litigation pending in the Court of Claims at Washington on said claims, and of the prospects of recovery thereon, as fully and completely as any one could be advised of such matters."

In January, 1917, the appellee filed another petition, which, so far as it relates to the present controversy, is in some sense a replication to the answers of Bray and Eichel, and in part a repetition of the original charges, and in which it is prayed that each of them be required to make specific answers to certain interrogatories respecting the amounts of money received from the several judgments against the United States, and the disposition made of the same. To this petition separate answers under oath were filed by Bray and Eichel, each of which answers seriatim the interrogatories propounded and repeats a denial of the charges of fraud and collusion. In Bray's answer it is stated, as alleged in appellee's petitions of June, 1915, that he received on the judgments mentioned, on August 12, 1908, $9,725.10, on July 16, 1910, $14,381.90, and on September 23, 1910, $1,639.57, or a total of $25,-746.57, and no more. His answer also contains an itemized statement of the payment of this total, showing that $7,780.08 was paid to Eichel, $5,231.33 to Dudley & Michener, and the balance applied on an indebtedness of Eichel to Bray individually, the nature and circumstances of which he explains.

Eichel's answer, in addition to answering seriatim the specific interrogatories, repeats his denial of any fraud, concealment or collusion, and prays that his former answer—

"be taken and read as an answer to this latest petition, and this defendant denies each and every allegation in said petition contained, not admitted in this answer or in said answer to said petition of the 15th day of June, 1915."

It was on these petitions and answers, the nature and contents of which we have thus outlined, and without the testimony of witnesses or other evidence, that the referee made and the court below confirmed the order which convicts the appellants of fraud, sets aside the sale to Eichel in 1908, and directs the payment by him and Bray of many thousands of dollars to the bankrupt estate. It would extend this opinion to undue and unprofitable length to discuss in detail the somewhat complicated facts involved, and we shall attempt little more than a general statement of the reasons which impel us to a different conclusion.

[1, 2] In the first place, it is to be noted that all the charges of fraud, collusion, concealment, misappropriation, and the like, are met with sworn denials which are positive, unqualified, and responsive to the allegations of the petitions in that regard. This being so, and the appellee offering no evidence, the charges fall for want of supporting

proof. Vigel v. Hopp, 104 U. S. 441, 26 L. Ed. 765; Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678. It follows, therefore, that the asserted fraud must be found, if found at all, in the admissions made by Bray and Eichel in their several answers. But what is true of the legal effect of denials is equally true of answering explanations of facts and circumstances claimed to justify the inference of wrong'doing. If the explanations are adequate, not improbable, or inconsistent with honest conduct, they must be accepted as truthful, in the absence of any evidence of their falsity; and reading the answers of the appellants in the light of this principle, we are unable to find therein any substantial basis for the accusations of the appellee.

For example, much is sought to be made of the fact that Eichel did not pay over the $6,500 for which he bought the claims in April, 1908, although the order provided that they should be assigned to him on payment of the purchase price. Unexplained, this might have some adverse significance. But Bray says, and his statement is nowhere discredited, that he overlooked this provision of the order, and supposed that the creditors had accepted and the referee confirmed the offer submitted by Eichel in writing, which was to pay the cash into court, "or as ordered by the referee on the day that a decree of distribution of the funds to the credit of this proceeding or suit is made and entered by the referee." When in July following attention was called to the actual terms of the order, Bray at once charged himself in account with the $6,500 and deposited the money to his credit as trustee in one of the designated banks. It seems to us that this is a reasonable explanation, and that it serves to relieve the transaction of any unfavorable bearing. The bankrupt estate got the full amount of Eichel's offer, that amount was included in the funds distributed, and whether Eichel paid the $6,500 himself, or Bray paid it for him, is of no practical importance. And we have some difficulty in understanding why the referee now stresses this incident as indicating fraudulent purpose, when the record shows that he himself accepted the explanation at the time it was made, as did all the creditors at the July meeting, and that he specifically approved of Bray's action in the order then entered.

Another illustration: It is broadly charged, and the referee finds, that Bray appropriated to his own use the sum of $12,735.19 from the moneys collected on the judgments against the United States. If this were true, it would go far to sustain the appellee's contention. But in his answer to the amended petition, in May, 1917, responding to a specific interrogatory in that petition, Bray gives a detailed statement by dates and amounts of the disposition made by him of the total sum received. He admits that he retained $12,735.19 of that total and applied the same on an obligation of Eichel, the nature and origin of which he explains; and he shows that the money he is accused of appropriating was actually used by Eichel's direction to pay Eichel's debt. And Bray had a perfect right to do this, if the facts were as he under oath alleges. No attempt was made to show that his statement in this regard was false, nor is it in any respect discredited, and therefore, for

the purposes now in hand, it must be accepted as truthful. In short, the charge that Bray shared in the profit which Eichel realized on the claims is wholly unsupported by proof. Moreover, and this seems to have been ignored by the referee, if there was a fair and valid sale of the claims to Eichel, the benefit of the bargain belonged to him, and what was done with the money recovered is not the concern of the creditors or the appellee.

And so of other circumstances which are put forward as evidence of a conspiracy to defraud the bankrupt estate. If the statement of them in the petitions can be said to warrant suspicion, that suspicion disappears when the denials and explanations of the answers are taken into account and their legal effect considered. It is only repeating to say that on the record as a whole the charges of appellee are unsustained by proof.

In the second place, we are of opinion that the appellee is not entitled to set aside the sale to Eichel, because it knew at the time, or had the opportunity of knowing, all the facts then available respecting these claims, and the status of the suits pending thereon in the Court of Claims. The appellee was a party to the bankrupt proceedings, and had due notice of all meetings of creditors. Its attorney was present at the meeting on the 11th of September, 1906, when a sale of the claims at auction was ordered. The trustee's report and application for leave to sell had been filed with the referee, and its contents were presumably known to all those in attendance. Attached to that report was a list of the claims, showing the amount of each and the several contracts out of which they arose. The trustee was interrogated, his deposition filed, and a sale agreed to without objection. In March, 1908, the referee received the offer of Eichel to pay $5,000 for the claims, and thereupon wrote to all the attorneys of record, including the appellee's attorney, for their views as to accepting the offer. Mr. Ambler's letter above quoted shows that the appellee was then relying, as the records of this court show it is still relying, on the bond of indemnity mentioned by him, and it is not doubtful that the appellee at that time was quite indifferent as to how, or when, or at what price the claims were sold, or whether they were sold at all. But a meeting was called, as Mr. Ambler advised, of which the appellee was duly notified, and it was at that meeting that Eichel's later and increased offer was unanimously accepted by the creditors and confirmed by the referee.

[3] In short, it is evident that all the creditors and the appellee were aware of these claims and the suits pending thereon, and had opportunity to make any desired investigation, for more than a year and a half before the sale to Eichel; and the sale was not then made in haste or without consideration by those who cared to be concerned. To annul a judicial sale made under such circumstances, at the instance of a party that so long regarded the matter with indifference and took no steps to that end for nearly 7 years, could only be justified by the most cogent and convincing evidence of fraud; and to our minds no such evidence has been produced.

[4] The appellee seeks to excuse the delay by alleging that it did not learn until 1915 of Bray's letter to the referee, under date of April 5,

1908, informing him of the judgments shortly before recovered on three of the claims, and suggesting, therefore, that Eichel should raise his bid. But the obvious answer to this plea of ignorance is that it might have known and would have known of that letter and its contents, if it had attended the meeting on the 30th of April, of which it had due notice. The referee says in his report "that on April 5, 1908, said M. J. Bray had written to the referee that a judgment had been rendered in favor of the trustee amounting to $9,730.00, subject to appeal by the government," and suggesting, as just stated, that Eichel should increase his offer. It must be presumed that this letter, or at least the information it contained, was submitted at that meeting. To intimate otherwise is in effect to charge the referee with concealment of important facts. And here again we are unable to understand why the referee should say in his findings that "there is no evidence that this fact had been communicated or known to any party in interest except the said Bray or Eichel." But the referee himself knew it, for he states in the same paragraph that he had received Bray's letter. Further comment seems unnecessary. We must hold that the appellee is estopped from questioning the validity of the sale to Eichel by its failure to investigate when it had the opportunity.

[5] It is undoubtedly the fact that Eichel, who had been for years the manager of the bankrupt concern, knew more about these claims than the creditors or the appellee, and had greater confidence that the pending suits would be successful; but such knowledge on his part was an advantage which rightfully belonged to him, and he was not thereby debarred from buying the claims, if in so doing he acted fairly and without deception. It stands uncontradicted that he had not been in the employ of the trustee or otherwise in any fiduciary relation to the estate for some 3 years before the claims were purchased; and for aught we can see he was as much at liberty to bid on the claims and become their owner as was any creditor or outside party. It was more or less a speculative venture, to say the least, and when all the circumstances are taken into account it cannot be said that he made an unconscionable bargain. True, a judgment had been recovered on three of the claims which would net about the amount of his offer, and if that judgment were paid without further contest he stood to win whatever more he might get by prosecuting the other suits. But all this was known to the creditors when they voted to accept his proposition. Since the government might take an appeal, and it is a matter of common knowledge that the government frequently appeals from adverse judgments, they may well have thought that the trustee was making a fortunate sale, as in that case there would be at best considerable delay and the risk of reversal; and clearly the sale is not to be set aside because that judgment was paid without appeal, and because other judgments were afterwards recovered, though at considerable expense and after 2 years more of litigation. It is enough to say, without further discussion, that from whatever point of view the case is considered it seems manifestly to lack that clear and convincing proof which is always necessary to establish a charge of fraud.

The decree below will be reversed, and the cause remanded, with in-

structions to dismiss the petitions so far as they seek to set aside the sale in question and to obtain a personal judgment against the appellants.

Reversed