**FLEET NATIONAL BANK, Plaintiff and Counterclaim Defendant,**

**v.**

**H & D ENTERTAINMENT, INC. (f/k/a Dover Broadcasting, Inc.) and H & D Management, Inc., as general partner of each of H & D Broadcasting Limited Partnership, H & D Media Limited Partnership, H & D Radio Limited Partnership, and H & D Wireless Limited Partnership, Defendants and Counterclaim Plaintiffs,**

**PNC Bank, Ohio, N.A., Charles E. Giddens, individually, as Receiver and as general partner of Media Venture Partners, Additional Counterclaim Defendants.**

Civ. A. No. 94–12385–NG.

United States District Court,
D. Massachusetts.

April 9, 1996.

Paul E. Morton, Law Offices of Paul E. Morton, Boston, MA, Martin F. Gaynor, Hanify & King, P.C., Boston, MA, for Charles E. Giddens.

Charles L. Glerum, Sara A. Walker, Choate, Hall & Stewart, Boston, MA, for Fleet National Bank.

Stephen F. Gordon, Gordon & Wise, Boston, MA, Stanley W. Wheatley, Gordon & Wise, Boston, MA, for H & D Management Inc.

Seth Grossman, Somers Point, NJ, pro se.

## MEMORANDUM AND DECISION

GERTNER, District Judge:

### I. INTRODUCTION

This court has been asked to approve the sale of the assets of a receivership.[1] The estate is comprised chiefly of four radio stations, which, prior to court appointment of a receiver, were owned and operated by the defendants and counter-claim plaintiffs.

The proposed sale has been repeatedly scrutinized by the market, by interested parties and by the court. It has been the subject of three competitive bidding processes and a magistrate judge's careful monitoring, during which the relevant parties were given an opportunity to object to sale procedures and substance, and through which, where appropriate, the procedures adopted came to reflect the concerns of the parties.[2] A clear choice among possible purchasers has emerged, a choice endorsed by those who have the most to lose: the debtors' chief creditors.

Nevertheless, defendants challenge the sale, focusing chiefly on three points: first, that the court-appointed receiver, with notice to all concerned and with court approval, engaged the brokerage firm in which he was a principal to assist in the sale; second, that one of the proposed purchaser's principals, at the time the initial bid was submitted, was a partner in an accounting firm which was providing basic services to the receivership estate; and third, that the terms of the sale, again with notice and with court approval, were amended at various stages in the sales process.

From these facts and others, defendants argue that the sale is so tainted that it should not be confirmed.

I disagree. For the reasons set forth below, I **ALLOW** the Receiver's sales motion, as detailed in his November 30, 1995 submission.[3]

### II. STATEMENT OF FACTS

#### A. Background

Defendants are members of an affiliated group of corporations and limited partnerships that are licensees or have ownership interests in radio stations in various cities in the United States ("H & D" or "The Borrower Group").[4]

1. Sale proponents are plaintiff and counter-claim defendant Fleet National Bank ("Fleet"), counter-claim defendant P.N.C. Bank, Ohio N.A. ("PNC"), and counter-claim defendant Receiver Charles Giddens. Sale opponents are defendants and counterclaim plaintiffs H & D Entertainment, and its affiliated group of corporations and partnerships that are licensees, of, or have an ownership in, the radio stations which are the assets of the receivership estate (hereinafter "H & D" or the "Borrower Group").

2. In accordance with 28 U.S.C. § 636 and the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, I referred this case to Magistrate Judge Karol for oversight of all procedural proceedings prior to sale confirmation and for reports and recommendation with respect to certain dispositive pre-sale motions.

3. The Receiver's sales motions include: Receiver's Motion to Authorize Sale of Receivership's Assets to Spring Broadcasting, L.L.C. or to a Qualified Second Round Bidder Free and Clear of Liens, Claims, Encumbrances and Interests with all such Liens, Claims, Encumbrances and Interests Attaching to the Proceeds of Sale in the Same Order and to Authorize the Assumption and Assignment of Executory Contracts filed with this Court on August 29, 1995, as modified by the Receiver's Motion to Approve Assumption, Assignment and Amendment of Local Management Agreement for Radio Station WKOE in Atlantic City, to Approve Waiver of Material Adverse Change Clause and to Authorize Entry into the Consulting Agreement filed with this court on November 13, 1995, and subsequently modified by the Receiver's Motion to Approve Modification of the WKOE LMA, Second Amendment to Radio Station Asset Sales Agreement and to Authorize Notice and Counteroffer Procedure Respecting Same filed with this Court on November 30, 1995.

4. Defendant H & D Entertainment, Inc., f/k/a Dover Broadcasting, Inc., with its principal place of business in Connecticut, operates radio stations WBSM–AM in New Bedford, Massachusetts, and WFHN–AM in Fairhaven, Massachusetts (the "Entertainment Stations"). Defendant H & D Management, Inc. ("Management") is the general partner of H & D Wireless Limited Partnership ("Wireless"), H & D Broadcasting Limited Partnership ("Broadcasting"), H & D Radio Limited Partnership ("Radio"), and H & D Media Limited Partnership ("Media"). Wireless operates radio station WSUB–AM and WQGN–FM in Groton, Connecticut. Broadcasting operates the radio stations WFPG–AM and WFPG–FM in Atlantic City, New Jersey. Radio operates radio

From September of 1983 to May of 1988, Fleet and PNC entered into a series of agreements with defendants to provide revolving credit and term loans, secured by the Borrower Group's interests in the Radio Stations and other assets.

The loans went into default. On February 2, 1994, Fleet notified the Borrower Group that it was accelerating its obligations and demanding payment in full. After defendants failed to pay the amounts due, on February 10, 1994, Fleet began actions against H & D, its members, and their personal guarantors, seeking to recover the outstanding balances.

Fleet, PNC and the Borrower Group entered into a settlement agreement. In exchange for the Banks' forbearance of the debt, the Settlement Agreement set forth a schedule for liquidation of certain assets and for repayment of amount owed.[5] The Agreement also gave the Banks the right, if the

Borrower Group defaulted on its obligations, to have a receiver appointed to oversee the liquidation of H & D's assets.

On November 30, 1994, the Borrower Group failed to meet its obligations under the Agreement.[6]

### B. *Court–Appointed Receivership*

On December 2, 1994, Fleet filed a complaint seeking to recover the more than $12.9 million which defendants owed Fleet pursuant to certain promissory notes and guarantees. Fleet also sought *ex parte* appointment of a receiver to take possession, manage, operate and, subject to court approval, sell the Radio Stations.

On December 5, 1994, after an *ex parte* hearing, this Court allowed plaintiff's Motion[7] and appointed Charles E. Giddens as Receiver.[8] Giddens was ordered to take pos-

---

stations WRKS–AM and WXKLC–FM in Waukegan, Illinois. (Collectively, the Radio Stations, the Entertainment Stations, the Broadcasting Stations, and the Wireless Stations will be referred to as the "Radio Stations" or "Stations.")

5. For a more complete discussion of the terms of the Agreement, *see* Report and Recommendation Regarding Defendants'/Counter-claim Plaintiffs' Motion for Partial Summary Judgment (Docket No. 50) and the Banks' Cross–Motion for Summary Judgment (Docket No. 59) (July 11, 1995), adopted by this Court on October 25, 1995.

6. *See*, Report and Recommendation, *supra*, at 17–21.

7. Fleet's Ex Parte Motion for the Appointment of a Receiver and its Motion for an Expedited Hearing emphasized the amount owed Fleet from the H & D Borrower Group, that "the receiver [was] necessary (i) to preserve the status quo and ensure that those assets or funds which are or will be in the possession, custody or control of the H & D Borrower Group will be made secure; and (ii) to provide the means for the liquidation of the assets of the H & D Borrower Group as a going concern in the most commercially reasonable manner possible." *See* Plaintiff's Ex Parte Motion for the Appointment of a Receiver, at ¶ 3.

Fleet also noted the following in its December 1994 submission: Through the affidavit of its Vice President, David Lechner, Fleet made the court aware that certain principals of the H & D Borrower Group had threatened simply to "disappear," rather than cooperate with the sale of the stations. Lechner, in his affidavit, recounted a conversation with one of the H & D Borrower Group's principals, Joel Hartstone. According to

the affidavit, "Hartstone indicated that [the principals' personal] tax liability would be approximately 40% of the difference between the aggregate sales price of the Stations and $9 million to $9.5 million. He stated that in light of the H & D Borrower Group's total long term debt of approximately $14.3 million, [the principals] would need to sell the stations for more than $17.9 million before they would realize any benefit after meeting their personal tax liabilities.... Accordingly, Mr. Hartstone stated, he has a strong incentive for the value of the stations to be lower (at least down to their tax basis [of about $9 million with respect to the stations]) rather than higher if they are not liquidated for at least $17.9 million." *See* Affidavit of David T. Lechner (Dec. 2, 1994), at ¶ 12; *see also, e.g.*, Affidavit of Gregory C. Harbaugh (Dec. 30, 1994), at ¶¶ 6–10 (statement of a Vice President of PNC Bank with respect to H & D's valuation of the assets at $9 million at October 31, 1994 meeting); Affidavit of Dorene M. Conlon (Dec. 27, 1994), at ¶¶ 3, 4 (reporting that at a meeting on October 31, 1994, Hartstone indicated that he would "walk away" from the Stations if the lenders insisted on quick liquidation).

8. I agreed with the Banks' recommendation of Giddens as receiver. According to Giddens' testimony, which I credit, on or about December 1, 1994, the Banks' counsel invited at least four industry experts to bid for the position of receiver, requesting initially that they submit proposals "blind" to the exact identity of the assets. The Banks ultimately settled on Giddens. Plainly, the process was intended to satisfy the Banks' interest in finding an expert who would maximize the value of the assets and the sales price,

session, to operate and then, subject to court approval, to enter into a Purchase and Sale Agreement, to sell and to transfer the assets of the Borrower Group.

As was fully disclosed to this Court, Giddens was a principal in Media Venture Partners ("MVP"), a brokerage firm specializing in the radio industry. H & D had previously engaged MVP to broker the sale of the Radio Stations.[9] Specifically, Randall Jeffery, a principal in MVP, had served as H & D's exclusive broker from February 1, 1994 to December 1, 1994, on which date he resigned.[10] Jeffery resigned primarily because he believed that the H & D Borrower Group was demanding prices that were incompatible with conditions in the marketplace. *See* Affidavit of Randy Jeffery (Feb. 27, 1995), at ¶ 1.[11]

On December 16, 1994, defendants moved to vacate the order appointing a receiver. On January 3, 1995, after the Federal Com-munications Commission (FCC) approved the transfer of licenses to the Receiver,[12] defendants moved to withdraw their motion to vacate the appointment order, without prejudice to their claims against Fleet. I allowed defendants' motion to withdraw on January 17, 1995.[13]

### 1. *The Zitelman Group's Duties*

On January 20, 1995, Giddens retained the Zitelman Group, Inc. (TZG) to provide certain accounting services for the receivership estate.[14] Although TZG offered a wide range of services, the Receiver only engaged TZG in a limited capacity, hiring the firm to perform certain ministerial accounting functions.[15] TZG was engaged to prepare consolidated monthly financial statements and provide some routine services with respect to payroll taxes, such as reconciling the tax filings with payroll registers and weekly pay checks.

providing quality services for the most reasonable fees.

9. The principal business of MVP is to provide brokerage, appraisal and consulting in the radio broadcasting industry. As of December of 1994, MVP had sold over $600 million work of radio and television broadcast properties for the year of 1994 alone. *See* Affidavit of Charles E. Giddens (Dec. 5, 1994), at ¶ 1.

Giddens has over thirty-five years experience in the industry. In addition to consulting, he has owned or managed 44 radio stations. Giddens had been appointed by federal courts to serve as receiver for radio stations before, each time with his brokerage firm serving as broker. The Federal District Court had appointed him in 1991 as Receiver for assets which included a radio station in Richmond, Virginia. In 1992, the Federal District Court had appointed him to served as receiver of assets for a radio station in Birmingham, Alabama. In each case, MVP served as the broker for the receivership estate.

10. Jeffery had announced his resignation on October 31, 1994.

11. Neither Giddens nor Jeffery had knowledge of Fleet's intention to seek receivership for the radio stations at any time prior to December 1, 1994.

12. Over objections of the defendants, the FCC approved the assignment of the licenses to Charles E. Giddens as Receiver on December 19, 1994.

13. To be sure, defendants repeated their concerns about the fact that a receiver was appointed (an issue resolved at summary judgment), as well as about the particular person appointed in a number of pleadings after that date. On January 24, 1995, the H & D Borrower Group and its former management filed an Answer, Counterclaim and Jury Demand in which H & D has sued not only Fleet and its participant, but also, Giddens as Receiver and individually, and his brokerage firm, MVP. On June 20, 1995, defendants pressed for removal of the Receiver on grounds of conflict of interest, charging specifically that his services as broker for another client created a conflict with the receivership estate. On July 20, 1995, the Magistrate Judge denied defendants' motion without prejudice.

14. The Receiver was clearly within his authority to employ and fix the compensation for the services TZG performed. *See* Order Appointing Receiver (Dec. 5, 1994) at 1(a). After being appointed receiver, Giddens called Zitelman to ask him if he would be interested in providing some accounting services to the receivership estate. Zitelman then submitted a formal proposal to Giddens on January 13, 1995. After discussing the terms of the engagement, TZG was engaged by the Receiver on January 20, 1995.

15. I credit Zitelman's testimony with respect to the character of the services rendered. When asked by defendants' counsel at deposition whether he would describe TZG's functions as "acting as an outside CFO for the receivership," Zitelman responded that the function was "more like a bookkeeper." *See* Zitelman Dep. (Sept. 15, 1995) at 18.

The work was performed by Stewart Bassin. TZG did not have access to the raw financial data of the Radio Stations. For instance, in preparing the consolidated financial reports, TZG was given statements from each station which it then reformatted for the general report. Overall, TZG received monthly balance sheets, income statements, and general ledgers, as well as weekly cash reports and, in some instances, information on accounts receivable and payable.

In reviewing the testimony, I find that TZG did not advise the receivership, provide financial audits, or direct investment of assets, with respect to the Radio stations; nor did it participate in management decisions with respect to the operation of the Radio Stations or get involved in the MVP's sales efforts.

### 2. MVP as Broker

On February 3, 1995, the Receiver, with notice and full disclosure to this court of his interest in MVP, requested court approval to employ MVP as broker for the sale of the Radio Stations. Giddens reasonably recommended a broker familiar with the operation, programming and performance of the Radio Stations. In addition, because MVP offered the receivership estate a special commission arrangement, its brokerage services were provided at no actual additional cost to the estate.[16]

On March 9, 1995, after a conducting a hearing with respect to this and other issues, the Magistrate Judge approved the employment.[17]

### C. Bidding Processes

#### 1. First Round Bidding

##### a. General Process

On March 16, 1995, MVP, acting as broker on behalf of the Receiver, distributed about 200 offering presentations to potential bidders containing descriptions of: the stations' operations, their programming, their market and financial performance. All the information was current through January 20, 1995. After the initial presentation, MVP mailed a supplement to each potential bidder, including each Station's current financial statements from the most recent reporting period.[18]

In addition, MVP mailed over 600 letters of inquiry to prospective bidders identified through MVP's data base. The letters included information about the first round bidding process and a sample bid form. Finally, MVP announced the sale in a press release published in industry trade publications.

The bidding materials notified potential bidders that all bids would be subject to due diligence, the negotiation of a purchase and sales agreement, and, ultimately, court ap-

---

16. Jeffery testified that he discounted his commission. Additionally, had the estate engaged another broker, it might have faced paying a double fee. Under H & D's 1994 brokerage agreement with Jeffery, if, after MVP's resignation, another broker had sold the stations to one of the prospects originally approached by Jeffery, Jeffery might have been entitled to the commission.

17. Before the Magistrate Judge, defendants objected to MVP's appointment, making a rather tortured argument that MVP, who would be paid by commission (at a reduced rate), would engage in a "fire sale," and that they were not appropriate for the task. This second argument was particularly incredible given MVP's prior relationship with the H & D Borrowers' Group and MVP's obvious interest in selling the assets for the highest price possible.

Defendants never requested reconsideration of the Magistrate's ruling before this Court. Not-

withstanding the fact that they may have waived this issue as a legal matter, I find that there is no factual support for their allegations with respect to MVP's qualifications or efforts.

18. Defendants charge that materials sent out were inadequate, because the packages did not contain completely current information. I credit Jeffery's testimony with respect to this issue. He acknowledged that the offering brochures "were not distributed to interested parties immediately after they were prepared," but indicated credibly that "the delay was solely the result of the Borrower Group's opposition to the appointment of MVP as broker. Distribution was also delayed by the Borrower Group's unwillingness to supply information to the Receiver upon his appointment. In all cases, the brochures were updated by supplying interested parties with supplemental information regarding the receivership assets." See Affidavit of Randall E. Jeffery (April 25, 1995), at ¶ 1.

proval.[19]

### b. *Spring Group's Bid*

During the period between the announcement and the bid deadline, Jeffery sent bid packages to, and discussed the sale with, any interested potential bidders, among them the Spring Group, L.L.C. ("Spring"), an entity in which Zitelman is a principal.

Defendants have made, essentially, three allegations with respect to the preparation of the Spring bid: first, that Zitelman tried to conceal his interest in the bid Spring submitted; second, that the Spring bid was based on inside information; and third, that Giddens, Jeffery and Zitelman were somehow colluding to their personal advantage and to the detriment of the receivership estate.

After weighing the testimony before me, and particularly reviewing the able cross-examination of witnesses Zitelman, Jeffery and Giddens, I find defendants' allegations without merit.

First, Zitelman plainly did not try to conceal either his interest in bidding or his role in Spring. For instance, when he became interested in submitting a bid, he first asked the Receiver and Jeffery whether it would be appropriate for him to do so.[20] Once Giddens gave him the go-ahead, Zitelman made inquiries, formally requested and then received the bidding package, and only then

submitted a bid—on the Zitelman Group's letterhead.[21]

Second, there is simply no evidence that Zitelman used inside information to shape his bid.[22] To the contrary, the information to which Zitelman had access through TZG would have been wholly insufficient to put together the bid. As Zitelman testified, without the information in the books distributed to interested bidders (for which he specifically asked after being told that he could bid on the assets), he would not have been able to determine whether or how much to bid.[23]

Nor does the evidence bear out the third charge.[24] Jeffery supplied Zitelman with the same bid form as other bidders; he gave Zitelman the same general statement about his sense of the assets' value. In sum, Jeffery did not give Zitelman any information that was not given or available to other bidders.

By its deadline of April 13, 1995, MVP had received twenty-four first round bids for the Radio Stations. Giddens and Jeffery determined that Spring submitted the highest qualified bid, in the amount of $14,626,000, plus an amount equal to 80% of the face amount of current accounts receivable, amounting to a total purchase price of about $15,300,000.

---

**19.** In the first round bidding materials, the Receiver reserved the right to forego entering into a purchase and sales agreement in the event that no acceptable bid was received pursuant to the first round bidding process.

**20.** Zitelman notified the Receiver of his interest in bidding on the Stations and asked whether it would be appropriate. Giddens then sought advice of counsel. Ultimately, Giddens gave Zitelman permission to bid. Nothing in this factual scenario indicates a subversion of the bidding process. It suggests, instead, a concern for appropriate delineation of roles inconsistent with defendants' allegations.

**21.** Defendants have repeatedly charged that Zitelman's interest was purposefully concealed. As support for that allegation, they note the absence of Zitelman's personal *curriculum vitae* from the April 13, 1995 bid. Had this been more than simply an oversight, it surely would not have been corrected one day later, when Zitelman's *curriculum vitae*, detailing his business interests, was sent via facsimile to Randall Jeffery at MVP.

**22.** At most, Spring had access to some weekly financial information that all bidders received in a timely fashion via bid supplements.

**23.** At the November 3, 1995 hearing before this Court, Zitelman testified credibly that Spring could not responsibly have relied, in preparing its bid, on the information to which Zitelman had access because of TZG's services. Zitelman explained that he needed to look at the books sent out by MVP. In particular, he needed to examine: past financial history; market overviews; Arbitron ratings; lists of assets, of employees, and programming formats for each station; the competition in each market; the frequencies; the classification of stations; contracts; leases; general information on the history of the stations; as well as copies of coverage maps, detailing the listening area of the stations. As Zitelman stated, and I credit, this information became available to him once he became a potential bidder and was central to Spring's crafting of its bid.

**24.** I credit Jeffery's testimony in this regard.

With respect to this decision, defendants argue that the Receiver misled the court by characterizing the Spring bid as the highest and most qualified, so that he could sell the estate's assets to Zitelman. As support for this charge, defendants point to a misstatement of the Receiver's counsel at a hearing before the Magistrate Judge on May 3, 1995, indicating that Spring's first round bid was $1 million better than the next bid.[25] From this statement and other facts concerning Spring's financing, defendants argue that the Spring bid was precarious, and that it was not the highest qualified bid. I reject these contentions.

Clearly, the bids submitted offered different terms and would accomplish the goal of liquidation of all the assets in different ways. This Court had charged the Receiver with the task of comparing bids across these differences, assessing the financials of each bidder, and recommending that the sale move forward with a commercially reasonable bid—or bids—that served the best interests of the estate.

I find that the Receiver discharged this duty reasonably and without fault. Despite defendants' contentions to the contrary, compared on an "apples-to-apples" basis, the second best bid was still $300,000 less than Spring's. In addition to the advantage in terms of dollars offered, other factors weighed in favor of Spring. For instance, the second best option required aggregating two entirely separate bids. Had the Receiver chosen that option, the work of—and cost associated with—liquidating the assets would have considerably increased. The Receiver would have been required to negotiate two separate purchase and sale agreements; he would have been required to oversee two separate due diligence investigations; and he would been required to ensure that two separate purchasers could each obtain financing. In addition, the risk that the entire sale could be derailed would have been heightened, had a problem arisen with either of the two bidders. For all those reasons, the Receiver's determination that the Spring bid was the highest was clearly reasonable.

Defendants also argue that the Receiver's conduct in determining the highest bidder demonstrated an effort on the part of Giddens to conceal Zitelman's interest in the Spring bid. The evidence simply does not bear out this allegation.

The relationship between Spring, Zitelman and the Receiver was disclosed to defendants[26] and to the court in an affidavit filed by the Receiver on May 25, 1995.[27] The matter was discussed during a hearing conducted by the Magistrate Judge on that date. The Magistrate Judge appropriately determined that the sales process should move forward, that the sale opponents should be given full opportunity to depose Zitelman with respect to his relationship to the receivership and the bidding process, and that the issue would be reserved for the hearing on the confirmation of the sale, after defendants had been given the chance to explore their concerns.[28] Furthermore, effective June 19, 1995, after Spring had submitted its bid but prior to the negotiation of a purchase and sale agreement, TZG resigned as the Receiv-

25. As the Receiver's counsel acknowledged at a later hearing, counsel's statement did not reflect that other bidders had handled the issue of accounts receivable differently, with some leaving the accounts receivable out of their bids and for collection by the estate, and others including accounts receivable. The next best bid, for example, did not include accounts receivable.

26. On May 12, 1995, the Receiver sent to defendants, via counsel, copies of monthly financial statements bearing the name of The Zitelman Group as preparer. Such conduct is plainly inconsistent with attempts to conceal the bidder's role with respect to the receivership estate.

27. There is ample evidence that Giddens discussed the matter with counsel no later than April 18, 1995, seeking guidance on whether Zitelman's role with respect to the receivership estate presented a conflict of interest.

28. The Magistrate Judge authorized defendants to depose and seek extensive documents from Zitelman—on this occasion and again on November 3, 1995. In addition, he also permitted deposition of Spring's financiers to explore the charge that they backed Zitelman's bid because he was, allegedly, an insider. Having reviewed the testimony, I find that there was no evidence of inside information or of any attempts to trade on what defendants contend was Zitelman's inside status.

er's accountant.[29] Finally, while the sale opponents have persistently charged that Zitelman continued to work for the Receiver and enjoy access to confidential information with respect the receivership estate, their allegations are baseless.

### c. Negotiation of the P & S

Once it was determined that Spring was the highest first round bidder, Spring requested and received ongoing financial information regarding the Radio Stations. Spring also requested, and was granted, permission to speak directly with station managers and personnel. The information and access provided to Spring was entirely reasonable and proper; it was also available to other prospective purchasers so that they could participate on an equal basis in the second round bidding process.[30]

After substantial negotiations, Spring and the Receiver proposed a Purchase and Sale Agreement on July 31, 1995 for court approval.[31] The Radio Station Asset Sales Agreement (the "P & S") set forth specific terms for the sale of the receivership's assets and made some modifications on the initial bid. In particular, the adjusted purchase price was set at $13,976,000, exclusive of accounts receivable, reflecting arms length negotiations between the Receiver and Spring and the need to correct physical deterioration at the Stations discovered during Spring's due diligence.[32] Additionally, a "Material Adverse Change Clause" was included in the P & S, under which Spring would have the right to terminate the agreement if certain adverse changes in the performance or rating of the Radio Stations occurred prior to closing. Finally, in anticipation of an appeal of any order of sale from this Court, the P & S also provided for a local management agreement from the date of court approval of the sale forward for a period not to exceed nine months, during which time the successful bidder would waive the Material Adverse Change Clause, would manage the stations for 30 percent of the net operating profits of the stations, and the Receiver would, however, maintain two employees to oversee the operations, as required under FCC regulations.[33]

One other aspect of the Purchase and Sale Agreement bears mentioning: The initial bidding materials had given potential purchasers the option to assume freely certain of the estate's executory contracts. In the P & S, Spring had done so, with an exception. One contract Spring did not assume was the Local Management Agreement ("LMA"), between defendants and Ocean Communications, pertaining to WKOE, a radio station in Atlantic City.[34] The LMA for WKOE, essentially, permits the owners of WFPG [35] to operate WKOE, using WFPG's facilities and

---

**29.** According to credible testimony before this Court, Giddens requested that Zitelman resign before the two engaged in earnest in negotiations. Zitelman agreed.

**30.** I credit Zitelman's testimony before this Court in this regard. He testified that the information on which he relied in securing financial backing was not gleaned from the information to which TZG had access during its limited engagement, but rather came from the information he received as a potential bidder and through his own due diligence.

**31.** After the July 31, 1995 hearing, clarifying amendments were proposed, dated August 1, 1995.

**32.** The Purchase and Sale Agreement provided for a purchase of all of the Radio Stations, excluding accounts receivable, for a price of $14,-126,000 less $150,000 in credits for a net purchase price of $13,976,000. In addition, Spring agreed to purchase the net accounts receivable

represented on the Accounts Receivable Aging in the Current 30, 60, 90 day columns excluding barter receivables, for 80% of the total outstanding balance of the net accounts receivable as of the date of the closing.

**33.** The P & S was the subject of a lengthy hearing before the Magistrate Judge on July 31, 1995, during which objections were heard, and the Banks endorsed the proposed Agreement.

**34.** At the time the receivership assets went out to bid, the Receiver had neither assumed nor rejected the LMA with respect to WKOE. It was his belief, which I find both reasonable and credible, that the terms of the LMA were substantially in excess of prevailing market rates, and that it could be renegotiated with Ocean Communications once a potential purchaser had been identified.

**35.** WFPG–AM/FM is an Atlantic City Radio Station in the receivership estate.

equipment, in exchange for a monthly fee.[36] Zitelman did not assume the LMA for WKOE, believing the monthly fees to be excessive.[37]

While the LMA was not assumed, Spring agreed to purchase all of WFPG's equipment, as well as other proprietary assets necessary to operate WKOE. As Zitelman testified, Spring believed it could choose to assume the contract at a later date, if it succeeded in negotiating for terms more in line with market rates.[38]

### d. Second Round Bidding

On April 20, 1995, the Receiver had requested that the court approve certain bidding procedures for the sale of the estate's assets, including a second round bidding process. The Receiver proposed that the successful first round bid(s) be subjected to counter-offers in a second round overbidding process, in order to maximize the value received for the estate. Concerned that such a second round would chill the interest in bidding initially, the Receiver also suggested that prospective first round bidders be offered break-up fees and overbid protections, designed to cover the costs of a first-round bidder's efforts in the event that, in the end, the stations are sold to another potential purchaser.

On August 4, 1995, following five days of hearings, the Magistrate Judge adopted the Receiver's recommended procedures. As provided in the P & S, Spring delivered a deposit of $1,412,600, on August 22, 1995. Thereafter, on August 29, 1995, the second round bidding process was set in motion, with the P & S negotiated with Spring serving as the first round bid against which subsequent bids would be tested.

MVP, again acting as broker for the Receiver, distributed notice of the second round bidding procedures to all the unsuccessful first round bidders, as well as to others who had expressed an interest in the Radio Stations but who had not submitted a bid in the first round. Among other things, the notice (1) described the bidding process; (2) included copies of the Agreement entered into between Spring and the Receiver in July of 1995; and (3) invited potential bidders to call the broker with any questions with respect to filing competing bids for the stations. MVP also mailed potential bidders updated offering presentations and arranged for broader notice about the bidding process, including publication of second round bidding procedures for a period of two weeks in the two widely read industry publications.

The materials fairly identified the condition and performance of the Radio Stations.

The court initially set October 6, 1995 as the deadline for completion of due diligence by second round bidders and October 16, 1995 as the deadline for submission of qualified second round bids. On a motion of the Receiver, the court extended the due diligence period until October 11, 1995, specifically to accommodate the due diligence of one second round potential bidder, which had initially submitted a second round bid in the amount of $15,500,000. On a subsequent motion of defendants, this court agreed to hear evidence of and consider other bids during the scheduled hearings to confirm the sale.

No second round bid was submitted.

On October 27 and November 3, 1995, this court held evidentiary hearings with respect to the Receiver's motion to sell the receivership assets to Spring pursuant to the Radio Station Asset Sales Agreement entered into

---

**36.** All assets associated with the programming and operation of WKOE, except the broadcast tower, transmitted and broadcasting license, are owned by the receivership estate and are part of WFPG in Atlantic City.

**37.** Zitelman's view has been supported by industry expert Robert Maccini, who described the monthly fees in the original LMA as "onerous," at a hearing before this Court on November 3, 1995.

**38.** I credit Zitelman's testimony with respect to this issue. On January 19, 1996, Zitelman testi-

fied that Spring had determined its bid price based on the premise that Spring could acquire the WKOE/LMA, believing that the contract would be freely assumable and that it would be desirable if the terms could be renegotiated. Zitelman testified that he discussed the WKOE/LMA with the Receiver during the first round of negotiations and prior to signing the initial purchase and sale agreement, and that he agreed that he and the Receiver could negotiate with Ocean Communications after signing the P & S.

on July 31, 1995, as amended on August 1, 1995.

At the October 27 hearing, counsel for the Receiver brought to the attention of the Court and defendants a letter setting out two nascent agreements between the Receiver and Spring: the first, an agreement in which Spring would waive the Material Adverse Change Clause in the initial Purchase and Sales Agreement in exchange for assumption of an amended LMA for WKOE, and the second, a proposed Consulting Agreement. As to the agreement to waive the Material Adverse Change Clause in exchange for assumption of an amended LMA for WKOE, the Receiver explained that he was concerned that events could trigger the Material Adverse Change Clause and that he wanted to negotiate to rid the agreement of that possibility. The amended LMA, permitting the purchaser of WFPG to operate WKOE for fees more in line with market rates, had potential value to the owner of WFPG and therefore provided a fair exchange. As to the proposed Consulting Agreement, the Receiver testified that in the normal course of purchasing assets, potential buyers often enter into local marketing agreements (LMAs), essentially leasing the properties during the period between the closing of the transaction and the approval by the FCC of a transfer of license (as they had initially agreed to do in this case). However, the Receiver had come to believe that such an agreement would grant him inadequate control over the properties. Hence, he proposed elimination of the initially agreed to LMA and, as its replacement, a consulting agreement in which the successful bidder would have certain rights to operate the Stations, although the Receiver would retain full management control and hold over the assets, the licenses, and so forth. As to the reasoning for both proposals, I credit Giddens' testimony.[39]

Evidence with respect to the value of the Radio Stations was also presented. It was Robert J. Maccini's uncontradicted testimony that the fair market value of the Radio Stations as of July 31, 1995 was $13,325,000.[40]

One other point was undisputed: that the principal, interest and costs owed to the Banks were—even at that stage—well in excess of the sales price offered by Spring.[41]

### e. Proposed Assumption of an Amended WKOE/LMA; Waiver of the Material Adverse Change Clause and Consulting Agreement

On November 13, 1995, the Receiver filed a formal motion requesting that the court approve three changes in the overall agreement between Fleet and Spring: approval of an amended WKOE/LMA and the assumption of that contract by Spring; the award of a consulting agreement to Spring; and, in consideration for the WKOE/LMA, Spring's waiver of the material adverse change clause which had been part of the July 1995 purchase and sale agreement. The Magistrate Judge conducted a hearing with respect to this motion.

Defendants argued that Spring's waiver of the Material Adverse Change Clause was inadequate consideration for the Amended LMA and the consulting agreement. Sale proponents argued, on the contrary, that conditions were dangerously close to permitting the purchaser to opt out of deal because events might trigger operation of the Material Adverse Change Clause; that waiver of the clause had substantial value to the estate and that the exchange was a fair one, in the best interests of the estate.

Defendants made another argument: that all prospective bidders should have the opportunity to submit new bids in light of this change in the terms of the Spring P & S,

---

**39.** These proposed changes were the result of ongoing negotiations which reflect the Banks' and the Receiver's attempts to hedge against all unnecessary risks to the estate. In addition, particular changes expressly responded to concerns raised by defendants' counsel during hearings in July and August of 1995.

**40.** The P & S dated July 31, 1995, as amended on August 1, 1995, provided for a purchase price

of $13,976,000, or $651,000 more than the Stations' fair market value at the time the parties entered into the agreement.

**41.** It is undisputed that defendants have not paid any interest on their debt to the Banks since before the court appointed a receiver and that additional unpaid interest on the principal continues to accrue every month.

and, in particular, in light of the fact that the WKOE/LMA had substantial value.

### f. *Putting Amended Terms Out to Public Bid*

Significantly, the Banks and the Receiver agreed. On November 30, 1995, the Receiver moved to initiate a *third* round bidding process not previously contemplated by the parties, to give any interested bidders an opportunity to bid on the amended terms. In this third round, the amended Purchase and Sale Agreement, including the proposed assumption of the renegotiated WKOE–LMA, the waiver of the Material Adverse Change Clause, and the Consulting Agreement between Spring and the Receiver, would be tested against the bids of any other interested purchaser.

### 2. *Third Round Bidding*

The Magistrate Judge granted the Receiver's motion and initiated yet another round of bidding. After notice and court approval, new materials were prepared.[42] On December 8, 1995, notice of the third round bidding process and up-to-date information was mailed out to approximately 750 potential bidders. Since Arbitron ratings would be reported in early January, the Magistrate Judge set a new bidding deadline of January 12, 1996, to give potential bidders time to

analyze the new information before submitting a bid.

Defendants contended that the bidding process was defective, that all terms were not reasonably put out to bid, and that, in any case, the period for bidding was unconscionably short.

Having reviewed both the argument of the lawyers and the testimony presented on this issue, I find that the bidding procedure was reasonably calculated to invite bids and was executed without fault.

No third round bids were submitted.

On January 19, 1996, this court again held an evidentiary hearing with respect to the Receiver's motion to approve the Amended Purchase and Sale Agreement between Spring and the Receiver.[43] At the hearing, defendants failed to produce any evidence of collusion between the Receivers and Zitelman or Spring, or any misuse of confidential information for the benefit of Spring.[44] Instead, evidence disclosed that negotiations between the Receiver and Spring had been conducted at arms length[45] and that the terms of the Amended Purchase and Sale Agreement are commercially reasonable as well as in the best interests of the receivership estate.[46]

---

**42.** Defendants have argued that one aspect of the P & S could not be bid on by others: the amended LMA, a contract signed by the Giddens as Receiver, Zitelman for Spring, and Koplovitz, for Ocean Communications. I disagree. Based on the terms of the notice and Giddens' testimony, I find that it was reasonably clear that this contract could be assumed by any purchaser.

**43.** By this time, there was a serious question as to whether a material adverse change had indeed occurred that would permit Spring to withdraw from the deal if it did not waive its right to do so. In a letter dated January 4, 1996, Spring asserted that in November events occurred which would trigger the Material Adverse Change Clause and permit Spring to walk away from the agreement without penalty—and with a total refund of its $1.4 million deposit. The receivership would then be required to start the entire bidding process anew. While sale proponents have disputed Spring's characterization of the allegedly triggering events, the delay and difficulties involved in resolving the issue are beyond dispute.

**44.** On motion of defendants, the Magistrate Judge granted continued discovery with respect

to representations Spring might have made when securing financing, allowing defendants every reasonable opportunity to explore their concerns. Nothing improper was revealed.

**45.** In this regard, I credit the testimony of two of the businessmen at the center of the sale: Charles Giddens, the Receiver, and P. Richard Zitelman, one of Spring's principals.

**46.** According to Robert Maccini, who appraised the value of the Radio Stations, the original LMA may be considered an asset, valued at $267,287. As amended, the LMA has a value of $793,722. In particular, given the posture of this sale, I find exchanging the amended LMA for waiver of the Material Adverse Change Clause is certainly reasonable. As for the Consulting Agreement, I find that it too is prudent. The Receiver retains basic control of the assets during the pendency of any appeal but the designated purchaser may nevertheless be involved in the maintenance of the assets in question. The balance is an appropriate one.

It is worth noting that both the procedures used to sell the assets of the receivership and the proposed sale before this Court have been fully endorsed by the Banks, notwithstanding the fact that confirmation of this sale will leave the Banks with a deficiency. If there were alternative procedures or approaches that would have gone further to maximize the Banks' recovery, one might reasonably expect that they would have pressed for those alternatives. They did not.

At the conclusion of the testimony on January 19, 1996, I allowed the Receiver's motion to confirm the proposed sale of the receivership's assets to Spring. I also approved Spring's assumption of the amended LMA and the Consulting Agreement between the Receiver and Spring. My conclusions of law are set forth below.

## III. *ANALYSIS*

Defendants oppose the sale to Spring primarily on the basis of two alleged conflicts of interest: first, a conflict between Giddens, as Receiver, and Jeffery, as broker; and second, a conflict between Zitelman, as a principal in the Zitelman Group performing services for the Receiver, and Zitelman, as a principal in Spring. In addition, they challenge certain specific actions of the Receiver and the purchaser, which they suggest are sufficiently suspect to undermine confirmation of the sale.

The sale proponents, the Receiver and the debtors' chief creditors, the Banks,[47] argue

that this Court should confirm the proposed sale, that it is in the best interests of the estate, and that neither public policy nor established legal precedent prohibits it. They contend that a court-appointed receiver is vested with the equitable authority to sell property within the receivership to a good faith purchaser, where there is no evidence of fraud or improper use of confidential information. Spring, they assert, meets this standard.

I shall address the defendants' challenges to confirmation of this sale seriatim.

### A. *Giddens as Receiver and Principal in MVP* [48]

Defendants argue that the Receiver's decision to employ his own brokerage firm, even though it was expressly disclosed to, and approved by, this Court, created a conflict of interest and violated Gidden's fiduciary duty of loyalty. They also contend that his other ongoing professional commitments created a conflict of interest which can only be remedied by denying confirmation of the sale.[49]

Defendants' arguments are meritless.[50]

■■■■ The appointment of a receiver is a matter resting within the sound discretion of the court. Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2983. The goal of a receiver charged with liquidating assets is to obtain the highest price available under the circumstances. *See Jackson v.*

**47.** It should be noted that the Banks are not the estate's only creditors. There are many others, but—significantly—none has opposed the sale.

**48.** As noted above, at the outset of the sales process, there was a challenge to the appointment of a receiver. That issue was resolved by this Court's decision on summary judgment.

**49.** Defendants initially filed a Motion to Replace Receiver on Grounds of Conflict of Interest on June 21, 1995 before the Magistrate Judge. The motion was denied, without prejudice, on July 20, 1995. *See also* Defendants' Motion for New Sale Procedure and Process and for Order Restraining Receiver and Broker from Communicating With Potential Buyers Prior to Court Order for Sale Procedure (June 27, 1995). The motion was never renewed before this Court. Accordingly, the only issue before the Court is

whether the Receiver's alleged conflict of interest requires that the sale be avoided. As a general matter, courts have disfavored that result, instead surcharging, or denying compensation to, receivers and trustees whose conduct violated their obligations to the estates they were appointed to serve. *See, e.g., Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951); *Phelan v. Middle States Oil Corp.,* 154 F.2d 978, 991 (2d Cir.1946).

**50.** Giddens' qualifications for this post are beyond dispute. His years of experience and his uncontroverted success as a broker in the broadcasting industry, as well as his prior service as a federal court-appointed receiver, suited him to serve as a receiver for an estate consisting principally of radio stations, and where the court's charge to the receiver is to liquidate the estate's assets.

**240**

*Smith,* 254 U.S. 586, 588, 41 S.Ct. 200, 201, 65 L.Ed. 418 (1921).[51]

■ It is axiomatic that receivers are bound by fiduciary obligations to the court appointing them and to the estates they serve. *See, e.g.,* Clark, TREATISE ON THE LAW AN PRACTICE OF RECEIVERS, 3rd Ed., I, § 11(a); *Powell v. Maryland Trust Co.,* 125 F.2d 260, 261 (4th Cir.), *cert. denied,* 316 U.S. 671, 62 S.Ct. 1046, 86 L.Ed. 1746 (1942).

■ In the case of a court-appointed receiver, those duties are framed by the task he or she is ordered to accomplish.[52] Where a receiver is charged with liquidating an estate's assets, he or she is not required to adhere to imprudent restrictions that would unnecessarily impede achievement of that goal. Nor is the court required to impose restrictions that would bar individuals experi-enced in an industry[53] or familiar with the estate's assets from serving as the estate's receiver or as an agent of that receiver.[54] This is true both under the law of equity receivership[55] and within the more rigid confines of the modern Bankruptcy Code.[56] *See, e.g., In re Automatic Equipment Mfg. Co.,* 106 F.Supp. 699, 707 (D.Neb.), *appeal dis'd,* 202 F.2d 955 (8th Cir.1952) (where beneficiaries of trust knew and consented to trustee earning commissions by placing the insurance through his own agency and where there was no evidence of overreaching, the court had discretion to approve practice); *see also, e.g., In re Palm Coast: Matanza Shores, Ltd.,* 188 B.R. 741 (S.D.N.Y.1995); *In re Wilkinson Distributing Co.,* 106 B.R. 658, 660 (Bankr.D.Haw.1989);[57] *In re Greenley Energy Holdings of Pennsylvania, Inc.,* 94

51. In managing the estate, a receiver is bound to proceed with ordinary care and prudence, that is, exercising the care and diligence with which an ordinary and prudent individual would use in handling his own estate.

52. *See* Clark, RECEIVERS, Ch. II, § 43 & 43(a).

53. Where the assets relate to a highly specialized industry, with its own licensing requirements, among other things, this concern is particularly pointed. Indeed, the licensing requirements of the FCC with respect to radio stations give rise to a true need to have the process monitored by an industry expert and supporting professionals. *See, e.g., LaRose v. Federal Communications Commission,* 494 F.2d 1145, 1148 (D.C.Cir.1974) ("The Commission's regular practice is to approve an involuntary assignment of the license to a receiver in bankruptcy, who must then find a qualified purchaser and structure the sale in compliance with the mandate of Second Thursday [designed to minimize profit by the bankrupt parent-licensee].")

54. As a general rule of receivership law, a receiver's interest in the subject matter or relationship to one of the parties does not automatically require his removal. *Lincoln Printing Co. v. Middle West Utilities Co.,* 6 F.Supp. 663 (N.D.Ill. 1934), *aff'd,* 74 F.2d 779 (7th Cir.1935); *see also* 75 C.J.S. § 99 ("[W]here objections do not go to his entire want of capacity or disqualification, his mere interest in the subject matter or relationship to the parties will not absolutely require his removal; nor will a receiver who is competent, efficient, and impartial be removed merely because he is objectionable to one of the parties, or for other reasons which, under the particular circumstances, do not affect the proper performance of the duties of the office, or involve a loss, or danger of loss, to the receivership property or funds").

55. Disinterestedness within the context of receivership law has traditionally required that a receiver not have a direct interest in the estate. However, the touchstone of receivership law is its ability to respond to particular circumstances, as even the broadest statements of principle on the issue acknowledge. *See, e.g.,* 65 AM.JUR.2d, Receivers, § 133 at 963 (1972) ("Ordinarily, only a person who is without interest in a cause and who stands indifferent between the parties may be appointed a receiver therein. Therefore, a party to the cause will not ordinarily be appointed receiver unless both parties consent or there are special circumstances present which make such an appointment clearly for the best interest of all concerned").

56. The modern Bankruptcy Code provides more defined rules than had been the practice in the context of equity receiverships. *See, e.g., Rome v. Braunstein,* 19 F.3d 54, 57–58 (1st Cir.1994) (noting uniquely strict conflict of interest rules established under the Code are creatures of statute). What is permitted under the Bankruptcy Code, generally is, therefore, *a fortiori,* permissible under receivership law.

57. The *Wilkinson* Court considered whether a trustee could provide professional services for the estate he served. *See* 11 U.S.C. § 327(a) and (d). The court noted: "There is no reason that the Trustee should not be permitted to perform such services, provided that he is qualified to perform the services, and the fee charged is commensurate with his qualifications and comparable to that charged in the open marketplace." *Wilkinson,* 106 B.R. at 661.

B.R. 854 (Bankr.E.D.Penn.1989), reversed on other grounds, 102 B.R. 400 (E.D.Pa.1989).[58]

In *Matanza Shores,* the district court reviewed a bankruptcy court decision permitting a trustee to hire his own real estate firm to sell the chief assets of the bankruptcy estate. The *Matanza Shores* Court considered whether the Bankruptcy Code, which specifically permits a trustee to hire his or her own accounting or law firm for purposes of assisting the estate, limits a trustee's ability to hire his or her own firm only for the services listed or whether the Code permits a trustee to hire firms in which he or she has an interest to do other forms of work for the estate. Reasoning that Congress could have expressly prohibited a trustee from employing his own business, the *Matanza Shores* court declined to read a prohibition into the statute. Having found no bar at law, the court did not reach for one in equity.

■ Likewise, I decline to impose a broad prohibition in this case. I decline to hold, in equity, that a receiver may not make use of his own brokerage firm to sell the assets of the receivership estate, especially where, as in this case, use of the firm is so clearly not only reasonable, but in the best interests of the estate, and where there existed no fraud or concealment with respect to the relationship of the firm to the receiver. MVP was uniquely qualified to handle the sale, having both general experience in the industry and particular experience with the assets in question. Additionally, the relationship between MVP and the Receiver was "candidly set forth." It was also supported by the largest creditors of the estate and opposed by none. Finally, the Receiver sought and received court approval for a commission rate structure that was not only commercially reasonable, but also in the best interests of the estate.

The argument that the relationship between MVP as broker and Giddens as Receiver taints the proposed sale, accordingly, fails, as a matter of law and as a matter of fact.[59]

### B. Spring's Bid and TZG's Services for the Receivership

Defendants also oppose the sale's confirmation on the ground that a principal in Spring was also a principal in a firm that provided accounting services for the Receiver over a brief period of time. Sale proponents argue that while a current receiver may not purchase trust assets, it is simply not true that someone who served as his accountant during a brief period necessarily suffers under the same disqualification.

Defendants' argument raises essentially three questions: first, did Zitelman serve the estate in a fiduciary capacity? Second, if he did not, is he barred from purchasing assets merely as an agent of the receiver? And third, in any case, does the prohibition against self-dealing extend to a former accountant whose offer to purchase has been twice tested by the market, where there are no comparable offers and where the creditors whom any such prohibition is designed to protect, with full knowledge of the identity of the purchaser, approve of the sale and would suffer great harm is the sale were not approved?

I shall address these questions seriatim.

58. In *In re Greenley Energy Holdings,* the court upheld a trustee's decision to enlist the assistance of his brother who was an engineer with extensive experience in the development of products in the industry of the bankrupt estate not invalidated because relationship was "candidly set forth" and supported by creditors.

59. Defendants make another argument, contending that the sale is infirm because of another conflict involving MVP as the estate's broker. MVP, defendants point out, had represented Press Broadcasting in its purchase of a radio station in Atlantic City, New Jersey, WBSS–FM.

MVP had entered into its brokerage agreement with Press prior to the receivership. Although invited to pursue an interest in the receivership's WFPG–AM–FM also in Atlantic City, Press declined because of its own budget limitations. The station it purchased was valued at significantly less than the receivership's station in the same market. Hence, as a matter of fact, this transaction did not limit the marketing or brokering of the receivership's radio stations in Atlantic City. I find that this factual scenario does not create a conflict of interest with respect to MVP.

### 1. *Status: Question of Fiduciary Obligations of Accountant*

Defendants' assert, first, that a sale to Spring cannot be confirmed because of Zitelman's role as a principal of TZG. They argue that TZG's functions created a fiduciary relationship between Zitelman and the estate such that he is barred from purchasing estate assets.

Defendants assume too much. It is not always a simple matter to determine whether a fiduciary relationship exists. *E.g., Keenan v. D.H. Blair & Co.*, 838 F.Supp. 82, 89 (S.D.N.Y.1993) ("The precise contours of a fiduciary relationship are incapable of expression); *Franklin Supply Co. v. Tolman*, 454 F.2d 1059, 1065 (9th Cir.1972) (A 'fiduciary relation' is an elusive status ..."). There are certain relationships, such as the attorney-client relationship, partnerships, and trustee-cestui que trust, which, as a matter of law, are fiduciary in nature.

Others, such as the relationship of an accountant to the entity employing her or him, are less easily defined, and fact-driven. Generally, a fiduciary relationship will be held to exist between two persons "when one of them is under a duty to act or give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) Torts § 874, comment a (1979).

Where the relationship of the parties is not as a matter of law fiduciary in nature, the burden is on the party asserting the relationship to prove its existence. *E.g., Shofstall v. Allied Van Lines*, 455 F.Supp. 351, 360 (N.D.Ill.1978). The question of whether a fiduciary relationship exists is generally determined as a question of fact. *See, e.g., Wolf v. Weinstein*, 372 U.S. 633, 652, 83 S.Ct. 969, 980, 10 L.Ed.2d 33 (1963); *Pope v. University of Wash.*, 852 P.2d 1055, 121 Wash.2d 479 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994).

Defendants simply have not met their burden. They have not established that TZG was in a fiduciary relationship to the estate such that Zitelman is disqualified from purchasing the estate's assets.

Absent particular circumstances, an accountant-client relationship does not give rise to fiduciary obligations. *See Stainton v. Tarantino*, 637 F.Supp. 1051 (E.D.Pa. 1986) (accountant held not to have automatic fiduciary duties); *Tyra v. Woodson*, 495 S.W.2d 211 (Tex.1973) (short term business relationship insufficient to support imposition of a constructive trust). Where an accountant merely performs basic accounting functions, no fiduciary relationship is created. Only where an accountant's client is shown to rely on the judgment and advice of the accountant is a fiduciary relationship created. *See, e.g., Myers v. Finkle*, 950 F.2d 165, 168 (4th Cir.1991) (where accountant gave investment advice, a fiduciary relationship was created with respect to all services rendered by that accountant); *Martin v. Feilen*, 965 F.2d 660, 669 (8th Cir.1992), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993) (examining fiduciary status of accountant in the context of an Employee Retirement Income Security Act [ERISA] plan); *comp. Allard v. Smith et al.*, 56 B.R. 936 (Bankr. E.D.Mich.1986) (where performing audits, the court found that accountant's client reposited "faith, confidence, trust and reliance ... upon the judgment and advice" of the accountant such that a fiduciary relationship arose); *with Federal Deposit Ins. Corp. v. Schoenberger*, 781 F.Supp. 1155 (E.D.La. 1992) (where accountant as auditor had duty of independence and impartiality, no fiduciary relationship arose with any single client).

The weight of legal precedent—and common sense—stands for the proposition that an accountant takes on fiduciary obligations only where he or she "recommend[s] transactions, structure[s] deals, and provide[s] investment advice," *Martin v. Feilen*, 965 F.2d at 669, such that he or she exercises some managerial control over the assets in question.

In this case, there is no evidence that Zitelman's services to the receivership estate created a fiduciary relationship. As detailed above, the tasks performed by TZG were ministerial in nature. TZG simply did not provide management advice or exercise any discretionary control over the operations or

sale of the Radio Stations, nor did TZG have access to confidential information or even raw financial data. Accordingly, I find that neither TZG nor Zitelman individually had a fiduciary relationship with the estate.

### 2. *Sale to Former Accountant's Partnership*

 Since Zitelman did not have fiduciary obligations to the receivership estate, the question becomes whether he, as an agent of a receiver, is nevertheless prohibited from purchasing assets of the receivership estate.[60]

 Defendants argue that he is barred, relying heavily on the sweeping statements in a rather thin line of cases. *Donovan & Schuenke v. Sampsell,* 226 F.2d 804 (9th Cir.), *cert. denied sub. nom, Freedman v. Donovan & Schuenke,* 350 U.S. 895, 76 S.Ct. 152, 100 L.Ed. 787 (1955); *In re Frazin,* 181 Fed. 307, 310 (2d Cir.1910); *In re Q.P.S.,* 99 B.R. 843 (Bankr.W.D.Tenn.1989).

In *In re Q.P.S.,* a bankruptcy court determined not to confirm the sale by a debtor-in-possession (DIP) of property of the bankruptcy estate to the DIP's accountant. It interpreted Section 327(a) of the Bankruptcy Code as applying equally to agents and employees of trustees as to the trustees themselves.[61] The court stated: "A Chapter 11 trustee ... may not deal on his or her behalf with property of the bankruptcy estate, nor permit his or her agents and/or employees to do so.... An agent and/or employee of a trustee is held to the same fiduciary standards as the trustee." *In re Q.P.S.,* 99 B.R. at 844; *see also Donovan & Schuenke,* 226 F.2d at 812; *but see In re Exennium, Inc.,* 715 F.2d 1401, 1404 n. 5 (9th Cir.1983); *In re Transcontinental Energy Corp.,* 683 F.2d 326 (9th Cir.1982).[62]

Their reliance is this line of cases is misplaced. The First Circuit has never adopted the reasoning announced in the cases cited by the defendants. I decline to do so now.

While the attraction of a broad rule prohibiting any agent of a trustee from ever purchasing trust assets is obvious, the problems with such an approach are equally clear. Therefore in bankruptcy as well as in other trust or receivership contexts, courts balance the need for a fiduciary's highest fidelity to the estate and its beneficiaries, with the

**60.** Even if Zitelman were determined to have had fiduciary obligations to the estate, this sale could—and would—still be confirmed. Generally, courts have not imposed an absolute ban on *former* trustees or fiduciaries purchasing trust property.

The central issue is whether the sale is tainted by fraud or impropriety, that is "where, through personal as opposed to arms-length dealing, property of the estate is obtained at the lowest price as opposed to a higher price, and where the relationship between the seller and the buyer has been concealed," *In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 842 (Bankr.C.D.Cal.1991), or where the sale of assets to an insider appears to be done in bad faith. The question as to bad faith turns on whether the insider "breached its fiduciary duty of full disclosure." *Id.* Where the fiduciary did not, where he or she engages in vigorous arms-length negotiations, and where he avoids conflict of interest, the sale may be approved.

For instance, where a trustee was removed for a conflict of interest and subsequently purchased property from the bankruptcy estate in an open bidding sale, the court held that no per se rule required disqualification from purchasing the assets. The sale's confirmation was upheld. *Gross v. Russo (In re Russo),* 762 F.2d 239, 242 (2d Cir.1985). Indeed, as Justice Frankfurter noted in *SEC v. Chenery,* 318 U.S. 80, 85–86, 63 S.Ct. 454, 458–459, 87 L.Ed. 626 (1943): "But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?"

In this case, where the creditors of the receivership estate join with the Receiver in support of this sale, where the accountant resigned his post and did not have access to confidential information, and where the market bidding processes confirm the reasonableness of the sale, I cannot say that Zitelman failed to discharge his obligations, assuming for a moment he had them.

**61.** I will leave to one side the fact that *In re Q.P.S.* is clearly is not controlling, since it involves a matter of construction of the Bankruptcy Code.

**62.** Indeed, the weight given to *In re Q.P.S.* is not merited. The two cases on which the Western District of Tennessee relied for this proposition have been either significantly narrowed, *compare Donovan & Schuenke v. Sampsell,* 226 F.2d at 812; *with In re Transcontinental Energy Corp.,* 683 F.2d 326 (9th Cir.1982), or flatly overruled. *Comp. In re Exennium, Inc.,* 23 B.R. 782 (1982); *with In re Exennium, Inc.,* 715 F.2d 1401 (2d Cir.1983).

practical concern for liquidating assets in a reasonable and efficient manner.

Generally, where bad faith, fraud or impropriety has been established, courts have been willing to set aside or disallow sales of estate assets to individuals other than a trustee who have had some role in administering the estate.[63] However, absent such evidence, courts have been unwilling to stymie the efforts of a receiver or trustee to accomplish his or her goal of liquidation or reorganization.[64] *See, e.g., Jackson v. Pacific Energy Resources (In re Transcontinental Energy Corp.)*, 683 F.2d 326 (9th Cir.1982); *In re Rex Body Corp.*, 138 F.2d 912, 913 (2d Cir. 1943); *In re National Mining Exploration Co.*, 193 F. at 236–237.[65] Precedent simply does not support the proposition that individuals other than the receiver or trustee are subject to a *per se* disqualification as a purchaser of estate assets. This rule makes sense. Agents or employees of an estate— former or current—are often those in an industry or business community most likely to be interested in purchasing liquidated assets; to foreclose the possibility of even entertaining the bids of individuals who have had any connection to the estate would impermissibly chill the liquidation process and risk defeating another central goal of liquidation through receivership: the maximizing of the value of the assets for the benefit of the creditors.

This practical concern gives rise to still another: that courts carefully monitor the sales process and assure that there is full disclosure and good faith. Where negotiations are conducted at arms length, subjected to public scrutiny, and involve all the parties, absent a showing of a breach of fiduciary duty, the sale should be approved. *See, e.g., In re Apex Oil Co.*, 92 B.R. 847, 870 (Bankr. E.D.Mo.1988); *accord Bray v. United States Fidelity & Guaranty Co. (In re Evansville Contract Co.)*, 267 F. 533 (4th Cir.1920).[66]

This is such a case. Spring and the Receiver negotiated this sale and engaged in public bidding on its terms, under the watchful eyes of the estate's creditors, the debtors and the Magistrate Judge. Competing bids were solicited on three separate occasions: once before and twice after Zitelman's ac-

**63.** For instance, in *In re Intermagnetics America, Inc.*, 926 F.2d 912 (9th Cir.1991), the court permitted a trustee to bring an action against the debtor's chief executive officer when it was discovered that the CEO had indirectly purchased the assets of the estate after secret negotiations with the subsequent purchaser. The court held that officer of the DIP are officers of the court and that the sale should therefore have been disallowed. *Id.* at 917.

**64.** The *per se* rule has not even been followed uniformly in the circuits in which it has been announced as the standard within the context of bankruptcy liquidation proceedings.

Instead, even those courts have opted to adhere to a rule which respects both the need to sell assets in sometimes specialized markets and the need to avoid impropriety. For instance the Ninth Circuit, in *Jackson v. Pacific Energy Resources*, 683 F.2d 326 (9th Cir.1982), considered whether to set aside a confirmed bankruptcy sale where the buyer was an employee of the debtor-in-possession (DIP). The court determined that not all employees of the DIP must be disqualified from purchasing property from the estate, holding that only where the buyer holds a position of "unfailing loyalty, trust and confidence" with respect to the debtor or his or her estate would that employee be barred from purchasing property. Interestingly, this decision harkened back to a District of Massachusetts' case concerned with equity receiverships, in which the court had permitted a sale of property to a company, notwithstanding the fact that one of the estate's trustees was a director for, and a stockholder in, the company, noting that the involvement was fully disclosed, creditors had encouraged the purchase, and all the bankrupt's stockholders had been given a full and fair opportunity to participate in the sale. *In re Mining Exploration Co.*, 193 F. 232, 236–38 (D.Mass.1911).

**65.** As the *Transcontinental Energy* Court stated: "[U]nsubstantiated hypotheses and groundless innuendos" cannot substitute for proof of breach of duty. *Transcontinental Energy*, 683 F.2d at 328.

**66.** In *Apex Oil*, the court approved the sale of substantial assets to a group in which the controlling partners of the debtor were major non-controlling shareholders of the estate. The court found that "the Asset Purchase Agreement was the product of vigorous arms length, good faith negotiations among sophisticated parties. The Asset Purchase Agreement has evolved in a 'fish bowl' under the watchful eye of the Examiner and the Committee, with involvement of all major interested parties." *Id.* After the court conducted a three day hearing, it found no evidence that there had been a breach of fiduciary duty by the insiders and the motion to approve the sale was made upon adequate and proper notice and good faith.

counting firm, TZG, had resigned its position with respect to the receivership estate. All negotiations were at arms length and occurred after TZG's resignation; Zitelman possessed no information or assistance that was unavailable to all other bidders. Without question, the broker at all times acted with only one goal in mind: to maximize the proceeds of the sale for the benefit of the creditors. Without question, this goal has been accomplished.

Additionally, it is abundantly clear in this case that the bid procedures, monitored at each stage by the Magistrate Judge, were fair and reasonable. Finally, I find that the sale has been proposed to this Court for confirmation upon proper notice and good faith. No evidence of collusion, fraud or deceit undermines this proposed sale.

## C. *Best Interests of the Estate*

Finally, having determined that no broad public policy or established precedent erects a procedural bar to the sale's confirmation, I must determine whether this sale is commercially reasonable and in the best interests of the receivership estate.

The federal statute governing receivership sets forth the standards for sale of personalty by receivers at 28 U.S.C. § 2004. It provides that the court may sell personalty, "upon such terms and conditions as the Court approves, if it finds that the best interests of the estate will be conserved thereby." *Id.*

**67.** It is true of course that no competing bidder attempted to outbid Spring despite being given two opportunities to do so. There is no evidence, however, that the absence of competing second or third round bids was due to anything other than the fact that the Spring bid equalled or exceeded fair market value for the assets.

**68.** The Uniform Commercial Code provides that a secured creditor who has "sold in conformity with reasonable commercial practices among dealers in the type of property sold ... has sold in a commercially reasonable manner." U.C.C. s. 9–507(2). Section 9–507 of the U.C.C. also provides that a sale will be considered "commercially reasonable" if it is made in the usual manner in a recognized market, or sold at a price current in such market at the time of sale." U.C.C. s. 9–507(2).

Defendants argue that this sale is tainted. Defendants charge that the collusion which they believe is present in this transaction has had chilling effects on the willingness of others to bid on the four assets in question and that, therefore, there is no promise that the price for which Spring is asking to buy these assets is commercially reasonable and in the best interests of the estate.

I find defendants' arguments unpersuasive and entirely lacking in evidentiary support.[67]

 Commercial reasonableness may be established by a showing that the estate's assets are being sold for market value. *See Kobuk Engineering & Contracting Services, Inc. v. Superior Tank & Constr. Co–Alaska, Inc.*, 568 P.2d 1007, 1011 (Ala.1977); *Vic Hansen & Sons, Inc. v. Crowley*, 203 N.W.2d 728, 731 (Wis.1973); *see also Jackson v. Smith*, 254 U.S. 586, 588, 41 S.Ct. 200, 201, 65 L.Ed. 418 (1921); *Phelan v. Middle States Oil Corp.*, 220 F.2d 593, 605 (2d Cir.), *cert. denied sub nom.*, *Cohen v. Glass*, 349 U.S. 929, 75 S.Ct. 772, 99 L.Ed. 1260 (1955); *c.f.*, U.C.C. § 9–507(2).[68]

 In this case, the market has spoken on three different occasions, over a significant period of time. Reasonably identified potential bidders have been presented, fully and fairly, in my determination, with notice of the assets for sale, accurate descriptions of those assets and the contracts which might be assumed, and opportunities to purchase them.[69] Indeed, uncontroverted testi-

**69.** The U.C.C. requires that adequate notice be provided before a sale may be considered commercially reasonable. U.C.C. s. 9–504(3). Where a secured party is the seller of assets, that seller should (1) adequately describe in the notice the collateral to be sold as well as the time and place of the sale; (2) provide the notice sufficiently in advance of the sale to permit a reasonable opportunity for such people to participate; (3) distribute the notice to people who can be reasonably expected to have an interest in bidding; and (4) publish the notice in a manner reasonably calculated to assure the end result of competitive bidding and realization of the best possible price. *See Leasing Serv. Corp. v. Diamond Timber, Inc.*, 559 F.Supp. 972 (S.D.N.Y.), *aff'd*, 729 F.2d 1442 (2d Cir.1983).

In this case, notice clearly was adequate, in each of the three rounds of bidding. The process

mony presented to this Court indicates that the price offered by Spring for the assets is at least equal to fair market value, particularly in light of the full context of this sale.

Furthermore, despite months of efforts, defendants have not unearthed evidence of collusion or a single potential bidder who determined not to participate in the process because of the nature of the parties already involved.[70]

Finally, the repeated willingness of both the Receiver and Spring to submit this Purchase and Sale Agreement—and its various amendments—to the light of additional public scrutiny is inconsistent with the view of this sale as a shadowy inside deal.

Accordingly, after conducting evidentiary hearings on October 27, 1995, November 3, 1995 and again on January 19, 1996, I have determined that the process was conducted in a commercially reasonable fashion and that the results indicate that this sale is not only commercially reasonable, but also in the best interests of the receivership estate. This ruling extends not only to the terms contains in the purchase and sales agreement, but also to the negotiations which culminated in the amended LMA, the proposal that Spring assume that amended LMA for WKOE in exchange for a waiver of the Material Adverse Change Clause contained in the Purchase and Sale Agreement, dated July 31, 1995, as amended on August 1, 1995, and the proposal that Spring enter into a Consulting Agreement with the Receiver.

It is my determination that these final amendments, along with the terms of the Purchase and Sale Agreement, dated July 31, 1995, as amended on August 1, 1995, are reasonable and in the best interests of the estate.

## IV. CONCLUSION

For the foregoing reasons, I **ALLOW** the Receiver's Motion for Sale and Confirming Sale of Receivership's Assets to Spring Broadcasting, L.L.C. and **ALLOW** the Receiver's Motion to Approve Assumption, Assignment and Amendment of the Local Management Agreement, to Approve Waiver of Material Adverse Change Clause and to Enter into a Consulting Agreement.[71]

**SO ORDERED.**

---

of identifying bidders, the use of trade publications to cast the net more widely, the extension of bidding periods to ensure that parties could complete due diligence or have the most current rating figures: these procedures ensure the fairness of the notice.

**70.** The sale opponents have challenged the open nature of the bidding process, arguing on January 19, 1996 that the fact that both the Consulting Agreement and the contract spelling out the amended LMA specifically pertained to Spring, thus, they argue, creating an impression that the

deal had been sealed. From the evidence before this court, I cannot agree. The materials sent out in the third round bidding package indicated that the terms, subject to court approval, would be available to any successful bidder. Had any bidder been interested and troubled by what seemed like a limitation, he or she surely would have inquired and had his or her concerns allayed. No such inquiry was reported.

**71.** This memorandum accompanies my ruling announced in court on January 19, 1996.